462

J. Frank Staley, of Washington, D. C. (Francis M. Shea, Atty. Gen., John J. Morris, Jr., U. S. Atty., of Wilmington, Del., and David L. Kreeger, Arnold M. Knauth, and Irving R. Storch, all of Washington, D. C., on the brief), for petitioner.

Leonard J. Matteson, of New York City (Abel Klaw, of Wilmington, Del., Bigham, Englar, Jones & Houston, of New York City, Joseph W. Henderson, of Philadelphia, Pa., and Samuel D. Antopol, of New York City, on the brief), for respondents.

Before GOODRICH and McLAUGHLIN, Circuit Judges, and FAKE, District Judge.

GOODRICH, Circuit Judge.

The United States seeks a writ of mandamus, or prohibition, or both, against the United States District Judge for the District of Delaware on the ground that the District Court has no jurisdiction in a suit brought for the recovery of loss of certain tankers named, for the purpose of this action, "Mulligan" and "Bloom".[1] The petitioner states that the claim on which the principal suit is based is a matter exclusively for the Court of Claims. National Bulk Carriers, Inc., a Delaware corporation and former owner of the vessels, brought suit in the District Court of Delaware. The objection of the United States to the assumption of jurisdiction was fully heard and considered by the trial judge who wrote an opinion thoroughly discussing the matter. National Bulk Carriers, Inc. v. United States, D.C.Del.1944, 56 F.Supp. 765. He overruled the objections and directed the Government to answer on the merits. This petition followed.

The use of the vessels was requisitioned by the Administrator, War Shipping Administration, on time charter basis as at Noon, April 20, 1942, under authority of § 902 of the Merchant Marine Act, 46 U.S.C.A. § 1242,[2] and the standard form of re-

[1] As these vessels were lost as a result of enemy action at sea, they have been given fictitious names. The real names of the ships and the locus of destruction are detailed in the pleadings. In accordance with Admiralty Rules 44 and 46 of the Supreme Court, the pleadings have been impounded and all hearings are held in camera.

[2] The applicable provisions of this section read:

"(a) Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for the Commission to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property. The termination of any emergency so declared shall be announced by a further proclamation by the President. When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use. If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, such property shall be restored to the owner in a condition at least as good as when taken, less ordinary wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the property in such condition. The owner shall not be paid for any consequential damages arising from a taking or use of property under authority of this section.'

* * * * * *

"(c) If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, the Commission, at the time of the taking or as soon thereafter as the exigencies of the situation may permit, shall transmit to the person entitled to the possession of such prop-

ceipts provided for under that act were issued.[3] The Mulligan became a total loss through enemy action on May 12, 1942; the Bloom on May 16, 1942.[4] Thereafter, the loss of the ships being known, the War Shipping Administration and libellant, the National Bulk Carriers, Inc., the former owner of the vessels, entered into charter parties retroactively dated April 20, 1942, the date of requisition of the vessels. Under Clause 20 the charterer was to "provide and pay for or assume: (i) insurance on the Vessel, under the terms and conditions of the full form of standard hull war risk policy of the War Shipping Administration * * * (ii) all war risk insurance * * * on the lives of or for injuries to officers and crew and loss of or damage to their personal effects * * * and (iii) war risk protection and indemnity insurance, for the benefit of the Owner and the Charterer as their interests may appear * * *."

The libellant elected Option II of the charter, which was in fact the only one open to it.[5] It provided for war risk valuation on the basis of "Just Compensation to be determined in accordance with Section 902 of the Merchant Marine Act 1936, as amended, for any loss or damage due to the operation of a risk assumed by the Charterer * * * to the extent the person entitled thereto is not reimbursed * * * through policies of insurance against such loss or damage." War risk binders dated August 1, 1942 were issued insuring the vessels against war risk,[6] and warranting that in event of loss just compensation was to be determined in accordance with § 902 of the Merchant Marine Act, 1936, as amended.[7]

Payment on account for the loss of the vessels was made to libellant by the United States without prejudice to any of the rights of either of the parties, as provided in § 902 of the Merchant Marine Act, 1936,

erty a charter setting forth the terms which, in the Commission's judgment, should govern the relations between the United States and such person * * *. In the event of loss or damage to such property, due to operation of a risk assumed by the United States under the terms of a charter prescribed in this subsection, but no valuation of such vessel or other property or mode of compensation has been agreed to, the United States shall pay just compensation for such loss or damage, to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage.

"(d) In all cases, the just compensation authorized by this section shall be determined and paid by the Commission as soon as practicable, but if the amount of just compensation determined by the Commission is unsatisfactory to the person entitled thereto, such person shall be paid 75 per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum will make up such amount as will be just compensation therefor, in the manner provided for by sections 41(20) and 250 of Title 28."

[3] The receipts dated April 23, 1942 are substantially in the following form: This is to certify that the War Shipping Administration has requisitioned use on Time Charter basis of the Tank Vessel * * * pursuant to Section 902 of the Merchant Marine Act, 1936, as amended; that the undersigned, * * * acting for and on behalf of the War Shipping Administrator, has taken delivery of said vessel under said requisition effective as of April 20, 1942, at Noon m., C. W. T., and that such requisition has become effective at said date and hour * * *."

[4] The Bloom was torpedoed by enemy action on May 16, 1942 but reached port. Title to the vessel was thereafter requisitioned by the Administrator on July 18, 1942 "effective as of date of taking possession * * *." On April 18, 1944 she was declared by the Administrator to be a constructive total loss as of the date and time of torpedoing of the vessel, May 16, 1942. A receipt was issued certifying " * * * the War Shipping Administration has requisitioned title to and possession of * * * pursuant to Section 902 of the Merchant Marine Act of 1936, as amended, effective as of the date and hour of delivery thereof, * * * and that * * * War Shipping Administration, has received delivery of said vessel, under said requisition, this 21st day of July, 1942, at 12:01 a. m., C.W.T., and that such requisition has become effective at said date and hour * * *."

[5] Option I was applicable only to vessels constructed pursuant to construction contracts made and entered into before 1935 and the Mulligan and the Bloom were of more recent construction.

[6] It is provided in the binder that the premium is to be paid by the War Shipping Administration, which would indicate that the Administrator elected to perform its obligation under Clause 20 of the charter to "provide and pay for" war risk insurance on the vessel.

[7] Endorsement No. 2 provides, "War-

as amended. Libellant then brought suit in the District Court of Delaware pursuant to the provisions of §§ 221–229 of the Merchant Marine Act, 1936, as amended, by the Acts of June 29, 1940, c. 447, 54 Stat. 689, April 11, 1942, c. 240, 56 Stat. 214, March 24, 1943, c. 26, 57 Stat. 45, 50, §§ 1128–1128h of 46 U.S.C.A.[8] Section 221(a) authorizes the Administrator to insure American vessels against loss or damage by the risk of war; while § 225 provides that "In the event of disagreement as to a claim for losses or the amount thereof, on account of insurance * * * an action on the claim may be brought * * * against the United States in the district court of the United States * * * in the district in which the claimant * * * may reside * * *."[9]

It is contended on behalf of petitioner that § 225 is not applicable here because the claim is not disagreement as to a claim for losses on account of insurance. It is contended that this was not an insurance transaction at all because, as the dates given in the recital of the facts show, both vessels were lost by enemy action both before the charter was given the former owner and before the insurance binders issued. Since, at the time the insurance was written, it is argued, the loss had long since occurred and was known to both parties, there could be no insurance transaction. The result, therefore, must be that the owner has only a claim for compensation which must be pursued exclusively in the Court of Claims. Just how this argument would apply to the other items purported to be covered in the insurance contract, such as loss of the personal effects of the crew, is not explained. Perhaps it does not need to be in this litigation since the only question raised is that of recovery by the ship owner for his loss.

 We can agree that the basic conception of an insurance contract requires the assumption of a known risk at the time the contract is made. See 1 Cooley's

---

ranted in event of loss just compensation to be determined in accordance with Section 902, Merchant Marine Act, 1936, as amended, for any loss or damage thereto due to the operation of a risk assumed by the charterer under the terms of this charter to the extent person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage. * * *"

[8] Section 221(b) creates in the Treasury of the United States an insurance fund: "There shall be in the Treasury of the United States a revolving fund to be known as the marine and war-risk insurance fund (hereinafter referred to as the fund), to be used for carrying out the provisions of this subtitle, and to be constituted of such sums as may be appropriated to such fund and of moneys and receipts credited thereto as herein provided. There are hereby authorized to be appropriated to such fund such sums as may be necessary to carry out the provisions of this subtitle. All moneys received from premiums and from salvage or other recoveries, and all receipts in connection with this subtitle, shall be deposited to the credit of such fund. Payments of return premiums, losses, settlements, judgments, and all liabilities incurred by the United States under this subtitle shall be made from such fund."

It is alleged in the amended libel, and not controverted, that insurance was duly provided by the Administrator (War Shipping Administration) by entering such insurance in the Marine and War Risk Insurance Fund created in the Treasury of the United States under the provisions of § 221 (b) of the Merchant Marine Act, 1936, as amended, and appropriate premiums for such insurance were paid by the Administrator out of operating funds into said Insurance Fund.

[9] Sec. 225 provides as follows: "In the event of disagreement as to a claim for losses or the amount thereof, on account of insurance under this subtitle, an action on the claim may be brought and maintained against the United States in the district court of the United States sitting in admiralty in the district in which the claimant or his agent may reside, or in case the claimant has no residence in the United States, in a district court in which the Attorney General of the United States shall agree to accept service. Said suits shall proceed and shall be heard and determined according to the provisions of an Act entitled 'An Act authorizing suits against the United States in admiralty, suits for salvage services, and providing for the release of merchant vessels belonging to the United States from arrest and attachment in foreign jurisdictions, and for other purposes' * * * (known as the Suits in Admiralty Act), insofar as such provisions are not inapplicable and are not contrary to or inconsistent with the provisions of this subtitle. * * *"

The provisions of The Suits in Admiralty Act, 1920, 46 U.S.C.A. § 741 et seq., authorize the filing of a libel in admiralty in personam against the United States of America and regulate procedure in such a suit.

466

Briefs on Insurance, p. 4; 1 Couch, Cyclopedia of Insurance Law, § 61. On the other·hand, where there is an agreement to insure, the insurer is held even though the policy itself may not be issued until after the loss occurred and the fact known to the parties. Insurance Company v. Folsom, 1873, 85 U.S. 237, 18 Wall. 237, 21 L.Ed. 827; El Dia Ins. Co. v. Sinclair, 2 Cir., 1915, 228 F. 833, certiorari denied, 1916, 241 U.S. 661, 36 S.Ct. 449, 60 L.Ed. 1226; Hallock v. Commercial Ins. Co., 1857, 26 N.J.L. 268, affirmed in 1858, 27 N.J.L. 645, 72 Am.Dec. 379; Mead v. Davison, 3 Ad. & E. 303, 111 English Reprint 428 (K. B. 1835); see also United States v. Patryas, 1938, 303 U.S. 341, 345, 58 S.Ct. 551, 82 L.Ed. 883. We think that this is the line of authority which controls in the present situation. It is true, as the Government urges, that the power of the Administrator is to be exercised "in accordance with commercial practice in the marine insurance business." See § 226(c) of the Merchant Marine Act, 1936, as amended. But we do not draw the conclusion from this, as the petitioner does, that the issuing of insurance under the circumstances here was ultra vires. Everyone who has lived through the last few years knows the problem which confronted the country in the spring of 1942. The need for transportation was critical. The important thing was to keep transportation going. The paper work attendant to the securing of vessels could wait; the shipping emergency could not. If requisition, charter and insurance binders had all come simultaneously, or nearly so, this part of petitioner's argument would have no basis. We do not think it is bettered by reason of the fact that the pressing emergency with which the Administrator was confronted in 1942 postponed the execution of charters and insurance binders until several months after requisition was made. The obligation to furnish both to the owner in accordance with the statute arose at the time of the requisition and corresponds with the agreement for insurance in the cases above cited. The issuing of the papers only confirmed the transaction de facto concluded by the use of the ship in the service of the United States.

■ The petitioner contends that the provisions in the agreements entered into by the parties, that is, the charter and the insurance binders, compel libellant to proceed in the Court of Claims, under § 902 for determination of "just compensation". Libellant's election of Option II of the charter that war risk valuation on the basis of "Just Compensation * * * be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended", and endorsement II on the war risk binders warranting that in event of loss just compensation is to be determined in accordance with § 902 indicates that the parties intended that compensation be in harmony with the principles set forth under § 902 that the amount of the insurance be measured by the valuation formula provided thereunder. But this does not indicate an intent to convert insurance claims to those claims existing under § 902, but simply gives a standard for the measure of the promisor's obligation and the promisee's rights.

Acceptance of 75% of the amount to which the Commission considered libellant entitled under § 902(d) [10] does not indicate an intent that libellant be restricted to proceedings in the Court of Claims under the additional provisions of that section for the recovery of the "further sum as, added to said 75 per centum * * * [would] be just compensation therefor * * *."

■ Inasmuch as § 902(c) specifically states that the United States shall pay just compensation thereunder for loss or damage, "to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage", if no valuation of the property or mode of compensation has been agreed to, a suit in the District Court to obtain reimbursement under the insurance policies issued is directly in conformity with § 902. Determination of insurance claims is specifically within the exclusive jurisdiction of the District Court under § 225 of the Merchant Marine Act, 1936, as amended which provides actions are to be brought according to the provisions of The Suits in Admiralty Act, 41 Stat. 525, 1920, as amended, 46 U.S.C.A. §§ 741–752. See Brady v. Roosevelt S. S. Co., 1943, 317 U.S. 575, 63 S.Ct. 425, 87 L.Ed. 471; Johnson v. U. S. Shipping Board Emergency Fleet Corporation, 1930, 280 U.S. 320, 50 S.Ct. 118, 74 L.Ed. 451; United States Shipping Board Emergency Fleet Corporation v. Rosenberg Brothers & Company, 1928, 276 U.S. 202, 48 S.Ct. 256, 72 L.Ed. 531; cf. Matson Navigation Co. v. United

[10] See f. n. 2 supra.

States, 1932, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336. The parties by their contract would have no power to oust the District Court of such jurisdiction. Insurance Company v. Morse, 1874, 87 U.S. 445, 20 Wall. 445, 22 L.Ed. 365; Aktieselskabet Korn-Og Foderstof Kompagniet v. Rederi Aktiebolaget Atlanten, 2 Cir., 1918, 250 F. 935, 937, affirmed in, 1920, 252 U.S. 313, 40 S.Ct. 332, 64 L.Ed. 586.

█ Petitioner urges "practical considerations" to the effect that convenience in litigating claims of this character, of which we are advised there are a considerable number, is served by the restriction of litigation to the Court of Claims so that administrative officers will not be required to conduct law suits at points distant from Washington. We are not impressed with this argument, for we think that officers of either the Shipping Administration or the Department of Justice can appear in the various courts of the country without any more inconvenience than any one else is subjected to in that process.

Writ denied.